**In the Interest of J.B.**

**Appeal of J.B.**

Superior Court of Pennsylvania.

Argued Jan. 9, 2013.
Filed May 8, 2013.
Reargument Denied July 22, 2013.

Dennis A. Elisco, New Castle, Lourdes M. Rosado, Philadelphia, Stephen D. Colafella, Beaver, for appellant.

James P. Barker, Office of the Attorney General, Harrisburg, for Commonwealth, participating party.

BEFORE: DONOHUE, SHOGAN and WECHT, JJ.

OPINION BY DONOHUE, J.:

Appellant, J.B., appeals from the dispositional order imposed following his adjudication as delinquent for committing the offenses of criminal homicide, 18 Pa.C.S.A. § 2501(A), and criminal homicide of an unborn child, 18 Pa.C.S.A. § 2603(A). J.B. raises a single issue on appeal, in which he challenges the juvenile court's findings that he committed the crimes charged on the grounds that they are against the weight of the evidence. Because the evidence of record does not support certain of the juvenile court's crucial factual findings, we vacate the dispositional order and remand the case to the juvenile court for further proceedings consistent with this Opinion.

On February 20, 2009, the Pennsylvania State Police responded to a call at the residence of C.B. and K.M.H., J.B.'s father and stepmother,[1] in Lawrence County, Pennsylvania. The State Police found K.M.H., and her unborn male child (estimated delivery date of March 8, 2009) dead in the first floor bedroom. K.M.H. died from a shotgun wound to the back of her head, and the unborn child died of anoxia (lack of oxygen, directly resulting from the death of his mother). At approximately 3:30 a.m. on the morning of the next day, the police arrested J.B. (age 11), and on March 25, 2009, an adult criminal complaint was filed in the Court of Common Pleas of Lawrence County, charging J.B. with the two above-referenced counts of criminal homicide.

On October 6, 2009, J.B. filed a petition to transfer his case to the juvenile division. 42 Pa.C.S.A. § 6322. After evidentiary hearings, on March 29, 2010, the trial court denied the petition to transfer the case to the juvenile court. In so doing, the trial court indicated that it denied the petition in substantial part because J.B. refused to admit responsibility for committing the crimes at issue. J.B. then filed with the trial court a motion to amend its March 29, 2010 order to permit an interlocutory appeal. On May 12, 2010, the trial court did so, and on June 11, 2010, J.B. filed with this Court a petition for permission to appeal from an interlocutory order. We granted J.B.'s petition on July 27, 2010. On March 11, 2011, this Court concluded that the basis for the trial court's denial of J.B.'s section 6322 transfer petition violated his right against self-incrimination. Accordingly, we vacated the trial court's order and remanded the case for a new decertification hearing. By order dated August 23, 2011, the trial court granted J.B.'s petition and transferred his case to the juvenile court.

---

1. K.M.H. and C.B. were not married at the time of the events at issue here. We will on occasion refer to K.M.H. as J.B.'s "stepmother" solely for purposes of simplifying the description of their relationship. We will likewise on occasion refer to J.H. and A.H., K.M.H.'s daughters, as J.B.'s "stepsisters" for the same reason.

The juvenile court scheduled an adjudication hearing for August 24, 2011 and entered an order excluding the public from attending. Various media corporations filed petitions to intervene and open proceedings to permit their attendance, which the juvenile court denied by order dated September 23, 2011. On February 22, 2012, this Court affirmed the juvenile court's decision in a published decision. *In re J.B.*, 39 A.3d 421 (Pa.Super.2012).

During the pendency of the media appeal, J.B. filed a writ of *habeas corpus* with the juvenile court requesting his release from detention. 42 Pa.C.S.A. § 6335. The juvenile court, believing that it had no jurisdiction to enter orders during the pending appeal, denied the request. This Court subsequently remanded the case back to the juvenile court with instructions to immediately schedule and conduct a detention hearing. The juvenile court did so on April 3, 2012, at which time it decided that J.B. should remain in detention until the adjudication hearing.

The adjudication hearing took place on April 10–13, 2012. The evidence demonstrated that on the morning of February 20, 2009, K.M.H. called out from the first floor bedroom to J.B. and his stepsister, J.H. (then age 7), to tell them to get ready for the school bus, and that J.B. and J.H. left the house and ran down the driveway to catch the bus at approximately 8:13–8:14 a.m. N.T., 4/11/12, at 89. The school bus driver, Martin Gwin, testified that consistent with their normal pattern, J.B. ran about ten yards ahead of J.H. N.T., 4/10/12, at 153. Mr. Gwin did not observe anything at all unusual about the behavior or demeanor of either child as he transported them to school. *Id.* at 154.

Steve Cable ("Cable"), the owner of Steve Cable's Tree Service, testified that he and his crew of five arrived at the residence in three trucks at around 9:00

a.m., to continue the job, which began the prior day, of gathering firewood on the property. *Id.* at 14–15, 19. According to Cable, it was snowing that morning and approximately one-eighth to one-quarter of an inch of snow covered the ground. *Id.* at 20. Upon arrival, Cable stated that he did not observe any tire tracks in the driveway leading to the residence when his trucks arrived. *Id.* at 21, 35. At some point after his crew began to work, one of the workers came to him and told him that he had seen a screen door to the house open. *Id.* at 23. About ten minutes later, Cable saw a little girl, A.H. (then age 4 and K.M.H.'s youngest daughter), open the screen door. *Id.* at 24. She was crying, and when asked what was wrong, she said that her mother was dead. *Id.* A.H. remained inside the residence and Cable remained outside of the residence. *Id.* at 24–27. Cable testified that he initially called Bob Taylor, the owner/lessor of the property, but after getting no answer he called 911. *Id.* at 25.

Soon after calling 911, the state police returned the call and said they were having difficulty locating the address Cable had provided to them, apparently because of some confusion regarding the name of the road off of which the driveway to the residence was located. *Id.* at 36. Cable sent one of his workers (Gary Suchanec) to the end of the driveway to get the proper address and to wait for the police and ambulance to arrive. *Id.* at 37. Suchanec called Cable and provided him with the address, at which time Suchanec indicated that he could see footprints in the middle of the driveway. *Id.* Cable did not walk the entire length of the driveway, but he testified that he saw two sets of small footprints in the middle of the driveway between the tire tracks that his trucks had made. *Id.* at 38. The footprints aimed towards the road, and based upon their

size, Cable assumed they were probably made by the children living at the residence going to catch the bus. *Id.* at 21.

Trooper Harry Gustafson and Corporal Jeremy Bowser arrived at the residence at 10:13 a.m. *Id.* at 45. Trooper Gustafson found K.M.H.'s body in the first floor bedroom. *Id.* at 49. After the crime scene had been secured, Corporal Andrew Panelle and Trooper Kenneth Markilinski took possession of six long guns stacked in one corner of the upstairs bedroom, one of which was a 20–gauge shotgun. *Id.* at 109–11. While making sure that the guns were unloaded (for their safety), both Corporal Panelle and Trooper Markilinski noted that the 20–gauge shotgun was the only one that had the odor of burnt gunpowder and residue in the breech—which in their (non-expert) opinions was evidence that it had been fired within the past day. *Id.* at 114–15, 141–44.

Trooper Janice Wilson went to the school to interview J.B. and J.H. N.T., 4/11/12, at 61.[2] J.H. "didn't have much to offer about what had happened that morning." *Id.* at 64. She was initially upset when Trooper Wilson arrived, but calmed down when assured that she was not in trouble. *Id.* J.B. had earlier reported to the nurse's office with a stomachache and was asleep when Trooper Wilson arrived. *Id.* at 63. According to Trooper Wilson, in response to questions regarding his activities that morning, J.B. explained that the family was in the process of switching bedrooms, as his father and stepmother were going to move into the larger upstairs bedroom and he was going to move down to their first floor bedroom. *Id.* at 68. His clothes had been moved to the first floor bedroom, but they were not changing where they slept until the weekend. *Id.* Accordingly, J.B. told Trooper Wilson that he had gone down to get his clothes from the bedroom where his stepmother was sleeping, gotten his clothes for school, and changed in the bathroom. *Id.* After getting dressed, he and J.H. were sitting on the couch watching television when he heard his stepmother's cell phone click open or shut (suggesting that she was checking the time), and he then heard her tell them they needed to leave or they

---

**2.** All of the testimony regarding the statements made by J.H. and J.B. is the testimony of Trooper Janice Wilson. The transcript does not reflect that Trooper Wilson was referring to notes or any document to refresh her recollection of the interviews. The certified record from the adjudication hearing does not contain any exhibits involving the interviews.

In this regard, we must also acknowledge the proverbial "elephant in the room," specifically the absence of any testimony from J.H. at the adjudicatory hearing. According to the Commonwealth's theory of events, J.H. sat on the couch watching television in the room adjoining K.M.H.'s bedroom while J.B. perpetrated these crimes. Yet according to the scant evidence in the record regarding J.H., after being present in the home during the series of events resulting in the death of her mother (including a shotgun blast), she got on the school bus without the bus driver noticing any unusual behavior, and she did not report anything out of the ordinary to anyone that morning at school, including when interviewed by Trooper Wilson at the school.

In his closing argument, counsel for J.B. referred to the absence of J.H. as a witness for the Commonwealth, even though J.B. had been arrested at 3:30 in the morning on the day after the crimes after J.H. had provided the police with a second statement (despite the absence of any evidence at the adjudicatory hearing regarding the contents of, or even the existence of, such a statement from J.H.). N.T., 4/12/12, at 25. During his closing statement, counsel for J.B. also argued, again without any evidentiary basis in the certified record, that at a jury trial he would have been entitled to a missing witness instruction regarding J.H. *Id.* at 27. Finally, at oral argument, counsel for J.B. stated that the defense did not consider the possibility of calling J.H. to testify, and that he had not even attempted to interview her prior to trial.

were going to be late for the bus. *Id.* at 70. J.B. said that he and J.H. then got up and hurried to the bus. *Id.* In response to questioning, J.B. also told Trooper Wilson that as they went to the bus, he had seen a "large" or "full-size" black truck near the house by the garage, but did not see any people around that morning. *Id.* at 66–67. J.B. could not tell if the truck was running. *Id.* at 66. J.B. said that he told J.H. about the black truck, but that she was too far ahead of him and probably did not hear him. *Id.* at 70.

Trooper Wilson interviewed J.B. again at approximately 10:00 p.m. *Id.* at 72. Prior to this interview, J.B.'s father informed him for the first time that K.M.H. had died, at which time he cried, but did not ask any questions. *Id.* J.B. told Trooper Wilson that he had seen the black truck on the way to the bus when he reached down to pick up some "fur" or "fuzz" that he had dropped. *Id.* at 73. J.B. said that earlier that day he had seen a white truck that was like the black truck, and that he was told that the white truck was an S–10. *Id.* at 75. J.B. further indicated that he had seen a person wearing a white hat "ducking over" inside the black truck, and that its lights were on. *Id.* Trooper Wilson asked J.B. about his guns, at which time J.B. said that he had two, one of which was a 20–gauge shotgun that he only shoots when outside. *Id.* at 77. J.B. indicated that he had shot the 20–gauge shotgun within the past month, but not that morning. *Id.* at 77–78.

At 3:30 a.m. the next morning, the police arrested J.B. and charged him with two counts of criminal homicide. Upon J.B.'s arrest, the shirt, pants, tennis shoes, and winter coat he had worn that day were collected. N.T., 4/10/12, at 217–218. The police provided these four items to Elana Somple ("Somple"), the manager of the forensic science department at R.J. Lee Group, an independent laboratory. N.T., 4/11/12, at 5–6, 14. Somple tested two of these items, the shirt and pants, for the presence of gunshot residue.[3] *Id.* at 14. On the right side of the shirt (including the entire area from the top seam to the bottom as well as the sleeve), Somple testified that she found one particle of gunshot residue. *Id.* at 16. Similarly, on the left side of the pants (including the entire area from the waistband to the bottom cuff), Somple testified that she found a single particle of gunshot residue. *Id.* at 18. Other than to indicate the left or right side of the garment, Somple could not say where specifically the single particles were found. *Id.* at 16. Somple offered no opinion regarding how the two particles were deposited on the garments, indicating that it could have occurred in either of three ways: (1) the person discharged a firearm, (2) the person was in close proximity to someone who discharged a firearm, or (3) the person came into contact with something that had gunshot residue on it. *Id.* at 15–16.

On February 21, 2009, the day after the discovery of the shooting, Sergeant Daniel Brooks participated in a search of the ex-

---

**3.** At the instruction of the District Attorney, Somple did not test the winter coat or tennis shoes for the presence of gunshot residue. *Id.* at 136. Likewise, on the day K.M.H. was killed, J.B.'s hands were never tested for gunshot residue. The defense offered no evidence of independent testing of any of the articles of clothing.

Regarding the untested winter coat, C.B., J.B.'s father, testified that he and J.B. often practiced with their shotguns in the yard of the residence, and they had recently participated in a "turkey shoot" in an indoor facility with 25 to 30 other shooters. N.T., 4/11/12, at 142–44. At the turkey shoot, J.B. had worn the winter coat, the only one he owned. *Id.* at 146.

terior of the residence looking for shotgun shells or other potential evidence. N.T., 4/10/12, at 195, 207. While other officers found rusty casings in the yard, Sergeant Brooks found an un-weathered "Federal 20–gauge No. 6 shot" shell casing in what he described as "pristine" condition. *Id.* at 195–96, 201. Sergeant Brooks located this shell casing about 100 yards from the residence beside a fence running parallel along the right of the driveway, under leaves covered with ice and snow. *Id.* at 196–97, 210. Firearms and ballistics expert David Burlingame ("Burlingame") testified that the spent shell found by Sergeant Brooks had been fired by the 20–gauge shotgun found inside the residence. *Id.* at 40–41. Burlingame also testified that he examined 27 shotgun pellets removed from K.M.H.'s skull during the autopsy, N.T., 4/10/12, at 160, and that these pellets were consistent in size, shape, weight, and material as pellets found in 16 unspent 20–gauge shells found in the armoire of the first floor bedroom of the residence. N.T., 4/11/12, at 37, 44–45; N.T., 4/10/12, at 103–106.

Dr. James Smith ("Dr.Smith"), a forensic pathologist, opined that the shotgun was very near, or perhaps even touching, the back of K.M.H.'s skull when it was fired. *Id.* at 168. Because of the upward angle at which the weapon was fired, however, Dr. Smith opined that one would "not necessarily" expect to find blood or DNA tissue (commonly referred to as "blowback") on the barrel of the gun. *Id.* at 170–72. Corporal Jeffrey Martin testified that testing revealed no blood or DNA material on the inside of the barrel of the 20–gauge shotgun found in the upstairs bedroom, and no blood was found anywhere on J.B.'s clothing. N.T., 4/11/12, at 123–24. Corporal Martin also testified that no latent fingerprints (including from J.B. or anyone else) were found on the 20–gauge shotgun. *Id.* at 123.

Adam Harvey ("Harvey"), a former boyfriend of K.M.H., had an enforceable Protection From Abuse order against him, naming K.M.H. and her family (including her parents and sister and brother-in-law) as persons to be protected. *Id.* at 131, 205. In January 2009, Harvey had participated in DNA blood tests to determine the paternity of A.H., K.M.H.'s youngest daughter, and these tests had confirmed that Harvey was not her father. *Id.* at 206–07. On the night before K.M.H.'s murder, Harvey had to be escorted from a local club after an encounter with her parents. *Id.* at 126. On the day of the crime, the police located Harvey at around noon. *Id.* at 131, 189. He was driving his black truck, which had a thin layer of snow on the hood. *Id.* at 132–33. Harvey advised the police that he had been at his parent's house since 10:00 p.m. the prior evening, a story subsequently corroborated by his father. *Id.* at 133. A test did not detect the presence of gunshot residue on his hands.[4] *Id.* at 136–37.

Following the conclusion of the adjudication hearing and after closing arguments from counsel, on April 13, 2012, the juvenile court issued an order in which it set forth its findings of fact and conclusions of law, finding J.B. responsible for committing the two homicides. In a subsequent order dated April 20, 2012, the juvenile court adjudicated J.B. delinquent and in need of treatment, supervision, and rehabilitation, and ordered him to remain in detention pending a disposition hearing. Order of Court, 4/20/12, at 1–2. In a written opinion also dated April 20, the

---

4. As previously noted, the record does not reflect that any similar test was performed on J.B.'s hands. *See supra* n. 3.

juvenile court explained the basis for its finding that J.B. committed the killings:

> The testimony established that [J.B.] lived with [K.M.H.]. [J.B.] owned a 20–gauge youth model shotgun, which was established to be the murder weapon. The 20–gauge shotgun was discovered in [J.B.'s] bedroom immediately after the crime. [J.B.] had access to the shotgun shells, as they were located in [K.M.H.'s] bedroom, where [J.B.] had to go on the morning of the crime to retrieve his clothing. Further, forensic evidence established that [J.B.] had gunshot residue on the right side of his shirt and the left side of his jeans. The shirt and jeans tested were the same articles of clothing [J.B.] was wearing when he left for school on February 20, 2009. These facts all support the conclusion that [J.B.] is responsible for killing [K.M.H.] on February 20, 2009.

> \* \* \*

> The [court], after considering all of the evidence in its entirety, concludes that [J.B.] is responsible for the death of [K.M.H.]. The [c]ourt especially considers the absence of any unaccounted for foot prints or tire tracks around the home, the time period after the arrival of [Cable] and the tree service employees, during which no one was seen approaching or leaving the residence, and the forensic testimony of [Dr. Smith], [Somple], and [Burlingame] in determining that the Commonwealth has proved its case against [J.B.] by evidence beyond a reasonable doubt.

Juvenile Court Opinion, 4/20/12, at 12–13, 15.

On June 15, 2009, J.B. filed a notice of appeal, and on August 2, 2009 filed a concise statement of errors complained of on appeal pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure, in which he raised a single issue, namely that the juvenile court had abused its discretion because its decision was against the clear weight of the evidence. By order dated August 8, 2009, the juvenile court concluded that this issue had been "adequately addressed" in its order dated April 13 and its written opinion dated April 20. On appeal, J.B. raises the same issue for our consideration and determination: "Did the [juvenile court] abuse its discretion in finding that [J.B.] committed two acts of murder where the finding was against the weight of the evidence?" J.B.'s Brief at 6.

█ Before we consider this question, we must first address an issue the Commonwealth raises in its appellate brief—whether J.B. waived his weight of the evidence claim by failing to assert it formally in the juvenile court. Commonwealth's Brief at 10. On this issue, the Commonwealth relies upon this Court's decision in *In re R.N.*, 951 A.2d 363 (Pa.Super.2008). In *R.N.*, based upon older case law holding that in juvenile proceedings, appellants must preserve issues for appeal by first raising them in the juvenile court, we held that the juvenile appellant's failure to raise his weight of the evidence claim in the juvenile court resulted in a waiver of that claim on appeal. *Id.* at 372 (citing *Commonwealth v. DelSignore*, 249 Pa.Super. 149, 375 A.2d 803, 805–06 (1977) and *In the Matter of Smith*, 393 Pa.Super. 39, 573 A.2d 1077, 1081–82 (1990) (*en banc* )). In so deciding, we noted that Rule 520 [5] of the

---

**5.** Effective April 1, 2012, Juvenile Court Procedure Rule 520 was renumbered as Rule 620, without changes to its text. From this

point forward, we will refer to the rule by its new number.

Rule 620 provides in relevant part as follows: **Rule 620. Post–Dispositional Motions**

Pennsylvania Rules of Juvenile Court Procedure, which authorizes the filing of post-dispositional motions on an optional basis, did not apply in that case because the disposition order in *R.N.* was filed approximately one week prior to the rule's effective date. *Id.* at 371.

*In re D.S.*, 614 Pa. 650, 39 A.3d 968 (2012), calls into question the continued validity of *R.N.* to such an extent that we do not believe *R.N.* remains good law. In *D.S.*, the juvenile appellant asserted a sufficiency of the evidence argument on appeal that he had not previously raised in the juvenile court. *Id.* at 653–56, 39 A.3d at 971–72. Although adult defendants may assert sufficiency claims for the first time on appeal pursuant to Rule 606(a)(7)[6] of the Pennsylvania Rules of Criminal Procedure, no similar counterpart exists in the Juvenile Court Rules. *Id.* at 655–56, 39 A.3d at 972; Pa.R.Crim.P. 606(a)(7). Accordingly, in *D.S.*, the Commonwealth argued that the juvenile appellant's failure to preserve his sufficiency claim in the juvenile court constituted a waiver of that claim pursuant to Rule 302(a) of the Pennsylvania Rules of Appellate Procedure. *D.S.*, 614 Pa. at 655–56, 39 A.3d at 972; Pa.R.A.P. 302(a).[7]

Our Supreme Court disagreed, for three reasons. First, because Pa.R.J.C.P. 620 makes the filing of post-adjudication motions optional, "the failure to raise issues in such a motion may not be sanctioned." *D.S.*, 614 Pa. at 657, 39 A.3d at 973. Second, unlike adult defendants in criminal proceedings, juvenile defendants cannot seek recourse under the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541–46 ("PCRA"), because the PCRA does not apply to juvenile proceedings. *See* 42 Pa. C.S.A. § 9543(a)(1) (petitioner must be convicted of a crime). For this reason, a finding of waiver for failure to preserve a sufficiency claim in the juvenile court would be a harsher result than for a similarly situated adult criminal defendant. *D.S.*, 614 Pa. at 657–58, 39 A.3d at 973. Third, the juvenile court may provide its analysis of the sufficiency challenge in its Pa.R.A.P. 1925(a) opinion, and thus there is no impediment to an appellate court's review of a sufficiency claim in the first instance. *Id.*

The Supreme Court's rationale for refusing to find waiver in *D.S.* applies equally to preclude a finding of waiver in the present case. For adult criminal defendants, Pa.R.Crim.P. 607(A) provides that a weight of the evidence claim is waived

---

A. Optional Post–Dispositional Motion.
(1) The parties shall have the right to make a postdispositional motion. All requests for relief from the court shall be stated with specificity and particularity, and shall be consolidated in the postdispositional motion.
(2) Issues raised before or during the adjudicatory hearing shall be deemed preserved for appeal whether or not the party elects to file a postdispositional motion on those issues.
B. Timing.
(1) If a post-dispositional motion is filed, it shall be filed no later than ten days after the imposition of disposition.
Pa.R.J.C.P. 620.

6. Pa.R.Crim.P. 606(a)(7) provides as follows:

**Rule 606. Challenges to Sufficiency of Evidence**
(A) A defendant may challenge the sufficiency of the evidence to sustain a conviction of one or more of the offenses charged in one or more of the following ways:
(7) a challenge to the sufficiency of the evidence made on appeal.
Pa.R.Crim.P. 606(a)(7).

7. Pa.R.A.P. 302(a) provides as follows:

**Rule 302. Requisites for Reviewable Issue**
(a) General rule. Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.
Pa.R.A.P. 302(a).

unless it is raised with the trial judge in a motion for a new trial. Pa.R.Crim.P. 607(A).[8] The Pennsylvania Rules of Juvenile Court Procedure have no counterpart to Pa.R.Crim.P. 607(A) requiring that a weight of the evidence claim be preserved for appeal through presentation to the juvenile court. As a result, the only basis for a finding of waiver here would be Pa.R.A.P.'s 302(a)'s general requirement that issues must first be raised in the lower court. But application of Rule 302(a) in this circumstance would constitute a sanction against the juvenile defendant for the failure to file an optional post-adjudication motion pursuant to Pa.R.J.C.P. 620. In *D.S.*, the Supreme Court held that such a sanction is not permitted.

Also as in *D.S.*, J.B. would have no recourse to PCRA relief if we were to find that his counsel failed to preserve his only asserted claim on appeal, a result harsher than for a similarly situated adult criminal defendant facing waiver of a claim on direct appeal. Finally, the juvenile court in this case addressed J.B.'s weight of the evidence arguments in its Pa.R.A.P. 1925(a) opinion, and thus there is no impediment to appellate court review here. In his Pa.R.A.P. 1925(b) statement, J.B. set forth in detail his reasons why the adjudication of his guilt for the murders of K.M.H. and her unborn child were against the weight of the evidence. In its response thereto, the juvenile court stated that its prior order dated April 13, 2012 (containing findings of fact and conclusions of law) and its written opinion dated April 20, 2012 together "adequately addressed" all of the "issues set forth by the Juvenile." Order of Court, 8/8/12, at 1. Accordingly, the juvenile court has squarely addressed J.B.'s weight of the evidence claim and there is no obstacle to appellate review by this Court. Thus, we decide, based upon our Supreme Court's rationale in *D.S.*, that failure to file a post trial motion in a juvenile matter raising a weight of the evidence claim does not result in waiver of that claim.

Even if we were to conclude that our prior decision in *R.N.* maintains any continuing vitality in light of the Supreme Court's decision in *D.S.*, we would still not find waiver in the present case, as we find this case to be distinguishable from *R.N.* In *R.N.*, our decision does not reflect that the juvenile defendant in that case presented any weight of the evidence arguments in the juvenile court. *R.N.*, 951 A.2d at 365–66. To the contrary, in our opinion we did not identify any defenses raised or arguments asserted by R.N. at the adjudication hearing. *Id.* In the present case, in contrast, during closing argument J.B. presented precisely the same arguments to the juvenile court that he now asserts on appeal in support of his weight of the evidence claim. N.T., 4/12/12, at 3–42. Pa.R.J.C.P. Rule 620(A)(2) specifically provides that "[i]ssues raised before or during the adjudicatory hearing shall be deemed preserved for appeal whether or not the party elects to file a post-dispositional motion on those

---

8. Rule 607(A) provides as follows:

 **Rule 607. Challenges to the Weight of the Evidence**

 (A) A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:

 (1) orally, on the record, at any time before sentencing;

 (2) by written motion at any time before sentencing; or

 (3) in a post-sentence motion.

 Pa.R.Crim.P. 607(A). The Comment to Rule 607 provides that the "purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." Pa.R.Crim.P. 607 Comment.

issues." Pa.R.J.C.P. 620(A)(2). Thus, even before the Supreme Court's decision in *D.S.*, because J.B. sufficiently raised his weight of the evidence issues before the juvenile court during the adjudicatory hearing, pursuant to Rule 620(A)(2), he was not required to assert them again in an optional post-dispositional motion to preserve them for appeal.

 Finding no waiver, we turn to J.B.'s sole issue on appeal. We begin with our scope and standard of review for a weight of the evidence claim:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Widmer*, 560 Pa. 308, 319, 744 A.2d 745, 751–52 (2000); *Commonwealth v. Brown*, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. *Widmer*, 560 A.2d [Pa.] at 319–20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.' " *Id.* at 320, 744 A.2d at 752 (citation omitted). It has often been stated that 'a new trial should be awarded when the [fact-finder's] verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.' *Brown*, 538 Pa. at 435, 648 A.2d at 1189.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. *Brown*, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (Pa.1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Widmer*, 560 Pa. at 321–22, 744 A.2d at 753 (emphasis added).

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

> The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record

shows that the action is a result of partiality, prejudice, bias or ill-will.

*Widmer*, 560 A.2d [Pa.] at 322, 744 A.2d at 753 (quoting *Coker v. S.M. Flickinger Co.*, 533 Pa. 441, 447, 625 A.2d 1181, 1184–85 (1993)).

*Commonwealth v. Clay*, —— Pa. ——, ——–—, 64 A.3d 1049, 1054–55 (2013). This Court applies the same standard for reviewing weight of the evidence claims in juvenile cases as in those involving adults. *R.N.*, 951 A.2d at 370.

In *Clay*, our Supreme Court recently provided apt guidance for appellate courts when considering a weight of the evidence claim:

> *In reviewing the entire record to determine the propriety of a new trial, an appellate court must first determine whether the trial judge's reasons and factual basis can be supported.* Unless there are facts and inferences of record that disclose a palpable abuse of discretion, the trial judge's reasons should prevail. It is not the place of an appellate court to invade the trial judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function.
>
> To determine whether a trial court's decision constituted a palpable abuse of discretion, an appellate court must 'examine the record and assess the weight of the evidence; not however, as the trial judge, to determine whether the preponderance of the evidence opposes the verdict, but rather to determine whether the court below in so finding plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the jury.' *Where the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion.*

*Clay*, —— Pa. at ——–——, 64 A.3d at 1056 (quoting *Brown*, 538 Pa. at 436–37, 648 A.2d at 1190 (quoting *Thompson*, 507 Pa. 592, 599–600, 493 A.2d 669, 673 (1985)) (emphasis added)).

In accordance with this guidance, we have thoroughly reviewed the certified record on appeal to determine whether it supports the juvenile court's findings in this case or, to the contrary, whether the juvenile court "exceeded the limits of judicial discretion." *Id.* Based upon this review, and for the reasons set forth herein, we conclude that the record on appeal does not support the juvenile court's findings of fact. The juvenile court arrived at certain findings of fact crucial to its determination that J.B. committed the killings despite the absence of any evidence in the record to support them. In reaching this conclusion, we have not reassessed the credibility of any witness' testimony at the adjudication hearing, and have not in any respect substituted our judgment for that of the juvenile court. As required by *Clay*, we have circumscribed our review to an examination of the certified record to determine whether it supports the juvenile court's findings of fact.

In its written opinion, the juvenile court made clear that its decision depended in substantial part on its finding that J.B., his two step-sisters (J.H. and A.H.), and K.M.H. were the only people inside the residence on the morning of February 20, 2009, and that the evidence demonstrated that no other person entered the residence after the departure of J.B. and his seven-year-old sister and prior to the arrival of the Pennsylvania State Police. In its written opinion, the juvenile court found that "[t]he only imprints observed in the snow on that morning were the children's footprints leading from the house to the bus stop," from which the juvenile court concluded that "[t]here is no indication that

another person approached the residence, either by foot or in a vehicle after the children left and before [Cable] arrived with his employees." Juvenile Court Opinion, 4/20/12, at 14. The juvenile court emphasized this point again, stating on the next page of its opinion that, in addition to forensic evidence, it "especially considers the absence of any unaccounted for foot prints or tire tracks around the home, the time period after the arrival of [Cable] and the tree service employees, during which no one was seen approaching or leaving the residence...." *Id.* at 15.

These findings of fact were crucial to the trial court's conclusion that J.B. killed K.M.H. and her unborn child, since it limited the possible perpetrators of the crimes in question to J.B., J.H., and A.H.—*making J.B. the most likely choice among those three.* As the Commonwealth argues in its appellate brief:

> The Commonwealth introduced evidence that the only persons who were in the house were J.B. and [K.M.H.'s] two very young daughters. The baby who was left in the house with her dead mother obviously was not a reasonable suspect. There was no evidence that the older daughter had access to the guns and ammunition as did J.B.[9] J.B. had gunshot residue, albeit in a small amount, on his clothing. J.B. knew how to load and shoot the weapon used to kill [K.M.H.] and, in fact, had used the weapon previously. The only tracks in the snow leading from the home were those of the two school-age children. The [j]uvenile [c]ourt heard testimony that the only other persons present on

the premises that day, Cable and his employees, did not enter the residence.

> In sum, the [j]uvenile [c]ourt heard ample evidence that the only person with the ability to commit the murder was J.B. He was the only person present in the house with that ability. This verdict does not shock one's conscience.

Commonwealth's Brief at 12.

Based upon our review of the record on appeal, the juvenile court's original finding of fact that no other person "approached the residence" because of an "absence of any unaccounted for foot prints or tire tracks around the home," is not supported by any evidence introduced at the adjudicatory hearing. Juvenile Court Opinion, 4/20/12, at 14–15. The only witness to testify at the adjudicatory hearing regarding imprints observed in the snow was Cable, the owner of the tree service.[10] Upon arrival at the residence around 9:00 a.m., Cable indicated that the driveway leading to the residence was snow-covered, and that he did not observe any tire tracks on the driveway. N.T., 4/10/12, at 21, 35. As described in detail hereinabove, later that morning one of Cable's workers (Gary Suchanec) pointed out to Cable that he could see footprints in the middle of the driveway, and Cable testified that he then observed two sets of small (children's) footprints in the middle of the driveway between the tire tracks that his trucks had made. *Id.* at 35–38. From an evidentiary standpoint, Cable's testimony regarding his observation of these footprints is entirely unremarkable, as we know from the

---

9. The basis for this argument is unclear. Because the guns and ammunition were not locked away, anyone inside the residence had access to them. There was no evidence to establish whether J.H. could (or could not) load and fire a shotgun.

10. C.B., J.B.'s father, testified about which door the children would likely have used to exit the residence to catch the bus on the morning in question. N.T., 4/11/12, at 155–57. He did not testify to observing any footprints in the snow at any location on the property.

testimony of the school bus driver (Mr. Gwin) that J.B. and J.H. ran down the driveway to get on the bus on the morning in question. *Id.* at 153.

This summarizes the entirety of Cable's testimony regarding imprints in the snow. His testimony was strictly limited to his observations of snow imprints *in the driveway* to the residence. He was not asked, and did not testify, regarding any imprints in the snow anywhere on the property other than in the driveway, including at or around any of the four entrances to the residence.[11] As a result, at most Cable's testimony is evidence that no automobiles, other than Cable's work trucks, used the driveway that morning to approach or leave the residence by vehicle,[12] and that no person, other than J.B. and J.H. (walking to the bus), *used the driveway* to approach or leave the residence on foot.

The juvenile court, however, reached a much broader (and unsupported) finding of fact from Cable's testimony—namely that because the only footprints he observed were accounted for (J.B. and J.H. running to the bus), no other person approached the residence by foot that morning. The record simply does not support such a finding. No witness (including any of the police officers first arriving on the scene) testified to observing an absence of footprints on the property that morning, on any side of the residence, or at or around any of its four entrances. No witness even testified to making an attempt to look for

footprints in the snow (or the absence of the same), and no photographs of undisturbed snow anywhere on the property (including at either of the entrances to the residence) were entered into evidence. In point of fact, other than Cable's unremarkable testimony regarding the children's footprints in the driveway, the record on appeal in this case does not establish any basis for any finding regarding the presence or absence of footprints in the snow anywhere on the property. The juvenile court appears to have mistakenly concluded that no footprints existed based upon the absence of any testimony regarding the condition of the snow. This was error, and thus the juvenile court's finding of fact that no person entered the residence on the morning in question until after the discovery of K.M.H.'s body must be disregarded.

For similar reasons, the juvenile court's finding that "no one was seen approaching or leaving the residence" after the arrival of Cable and his employees also lacks any evidentiary support in the record on appeal. Juvenile Court Opinion, 4/20/12, at 15. During his testimony, Cable was not asked any questions regarding the presence of other people on the property between the time of his arrival and the discovery of K.M.H.'s body, and neither he nor any other witness provided any evidence on this issue. None of his employees were called to testify. In addition, Cable testified that while he and his em-

---

11. Photographs of the residence entered into evidence at the adjudicatory hearing show a door entrance on each of its four sides. N.T., 4/10/12, at Ex. 3, 4, 8, 9. The Commonwealth did not establish when these photographs were taken, so it is not possible to tell how much snow (if any) covered the ground around the entrances to the residence prior to the discovery of K.M.H.'s body. No footprints appear visible in any of these photographs.

12. The juvenile court found that C.B., J.B.'s father, left the residence at approximately 6:45 a.m. that morning. N.T., 4/13/12, at 6. On cross-examination, Cable testified that based upon his recollection of when and how much it snowed on the morning in question, a vehicle using that driveway at 6:45 a.m. would have left tire tracks. N.T., 4/10/12, at 31–32.

ployees were gathering wood, they remained at all times between the woods' line and the front of the house, N.T., 4/10/12, at 18, and Cable was neither asked nor testified that each of the entrances to the residence were visible from this location. Moreover, the juvenile court's finding ignores entirely the time period after the children left for school and before the arrival of Cable and his crew. The Commonwealth presented no evidence to establish whether or not anybody entered or exited the residence during this 45 minute span (from 8:15 a.m. until approximately 9:00 a.m.).

Having performed the ministerial function of determining whether the record on appeal supports the findings of fact relied upon by the juvenile court in reaching its decision, we conclude that it does not. *Clay,* —— Pa. at —— – ——, 64 A.3d at 1056 ("In reviewing the entire record to determine the propriety of a new trial, an appellate court must first determine whether the trial judge's reasons and factual basis can be supported."). The juvenile court found, without any supporting evidentiary basis, that the Commonwealth's evidence precluded the possibility that someone could have approached the residence on the morning of February 20, 2009 and killed K.M.H. and her unborn child. The juvenile court placed great weight on this finding, going so far in its written opinion as to emphasize that it *"especially considers* the absence of any unaccounted for foot prints or tire tracks around the home...." Juvenile Court Opinion, 4/20/12 at 15 (emphasis added). Because the juvenile court's decision re-

garding J.B.'s alleged commission of the homicides relied in substantial part on findings of fact that lack any support in the record on appeal, we must conclude that the juvenile court committed a palpable abuse of discretion in rendering a ruling that is plainly contrary to the evidence. As a result, we are constrained to vacate the dispositional order and remand the case for further proceedings consistent with this Opinion.

■ It is not within this Court's province to review the remaining evidence of record to determine whether its weight is sufficient to sustain the juvenile court's finding that J.B. committed the killings. We do not know and cannot speculate whether the remaining evidence would support the finding or, instead, shock the conscience of the juvenile court. Thus, our review ends because counsel for J.B. has not asserted a sufficiency of the evidence claim on appeal.[13] Moreover, J.B.'s counsel's assertion of a weight of the evidence claim without also asserting a sufficiency of the evidence claim in the alternative, resulted in a concession that there is sufficient evidence to sustain the finding of guilt. *See, e.g., Commonwealth v. Widmer,* 560 Pa. 308, 319–21, 744 A.2d 745, 751–52 (2000) ("A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict.").

For the reasons previously set forth, we conclude that J.B.'s weight of the evidence claim is meritorious, in that the juvenile court committed a palpable abuse of dis-

---

**13.** As a general matter, a sufficiency of the evidence claim requires us to evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Commonwealth v. Pettyjohn,* 64 A.3d 1072, 1074 (Pa.Super.2013).

"Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Commonwealth v. Brewer,* 876 A.2d 1029, 1032 (Pa.Super.2005).

cretion in rendering a ruling contrary to the evidence of record. We therefore vacate the dispositional order and remand the case for further proceedings consistent with this Opinion.

Dispositional order vacated, case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.