J-S03020-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF D.F., A JUVENILE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF:  D.F., A JUVENILE | |
| | No. 1483 EDA 2014 |

Appeal from the Dispositional Order February 18, 2014
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-JUV-0000436-2010

BEFORE:  FORD ELLIOTT, P.J.E., PANELLA, J., and OTT, J.

JUDGMENT ORDER BY PANELLA, J.                    **FILED MARCH 30, 2015**

D.F., a juvenile, appeals from the dispositional order entered February 18, 2014, following his adjudication of delinquency on the charges of rape by forcible compulsion[1] and unlawful restraint.[2]  No relief is due.

For a detailed recitation of the facts of this case, we direct the reader to the trial court's April 16, 2014 opinion.  **See** Trial Court Opinion, 4/16/14 at 1-5 (unnumbered).  D.F. was charged with the rape and unlawful restraint of a female acquaintance.  On January 28, 2014, the juvenile court adjudicated D.F. delinquent on both charges.  The juvenile court, in imposing its dispositional order, committed D.F. to an indefinite period of detention and ordered that he register as a juvenile sex offender.  **See** Disposition

_____

[1] 18 Pa.C.S.A. § 3121(a)(1).
[2] 18 Pa.C.S.A. § 2902.

Order, 2/18/14. On February 20, 2014, D.F. filed a post-disposition motion, which the juvenile court denied. This timely appeal followed.

On appeal, D.F. alleges that the evidence was insufficient to support his adjudication of delinquency for the crime of rape.[3]

> When a challenge to the sufficiency of the evidence is made, our task is to determine whether the evidence and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, were sufficient to enable the fact-finder to find every element of the crime charged beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. Moreover, we must defer to the credibility determinations of the [juvenile] court, as these are within the sole province of the finder of fact. The trier of fact, while passing upon the credibility of witnesses, is free to believe all, part, or none of the evidence.

*In re J.M.*, 89 A.3d 688, 691 (Pa. Super. 2014), *appeal denied*, 102 A.3d 986 (Pa. 2014) (citation omitted).

We have reviewed D.F.'s brief, the relevant law, the certified record, and the well-written opinion of the Honorable Nathaniel C. Nichols. Having determined that the juvenile court's opinion ably and comprehensively disposes of appellant's issues on appeal, with appropriate reference to the record and without legal error, we will affirm on the basis of that opinion.

Dispositional order affirmed.

---

[3] In his statement of questions involved, D.F. additionally alleges that his adjudication of delinquency for rape was against the weight of the evidence. *See* Appellant's Brief at 8. However, as D.F. does not address this issue in the argument section of his appellate brief, we consider this issue abandoned on appeal.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/30/2015</u>

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
JUVENILE DIVISION

IN THE INTEREST OF D.F.,           :           NO.   2013-000767
                                   :
          a Juvenile               :           Juvenile ID No.  J2010-000436


OPINION


NICHOLS, J.                                    FILED: 4-16-14


I. Procedural Posture.

On June 25, 2013, this petition was filed charging the juvenile, D.F., with Rape
and related offenses. The court held its hearing on this Juvenile Petition on January 28,
2014 and adjudicated D.F. delinquent in connection with Rape and Unlawful Restraint.
At the disposition hearing, the court committed the juvenile to an indefinite period of
placement at a facility where he was ordered to receive sex offender therapy. Counsel
for the juvenile filed a post disposition motion assailed both the sufficiency of the
evidence (as to the forcible compulsion aspect of the Rape) and the weight of the
evidence. We find no basis to support the juvenile's contentions and shall address
them *ad seriatim*.

II. Testimony.

The trial testimony offered by the victim, a young woman, was clear, cogent and
credible. She offered a plain-spoken rendition of the salient events of December 24,
2012, in Upper Chichester Twp., Delaware County, Pennsylvania. The victim was



friendly with D.F. Apparently, the juvenile was released from placement at Glen Mills School on a holiday "home pass." She acknowledged that her relationship with D.F. had a sexual component and that she was going to "meet up with him." NT at 9. *See also* NT at 77. After calling her cell phone, D.F. arrived at the young lady's home. When the two got together, D.F. became "playful" and, at one point, took the victim's cell phone and would not let her retrieve it. D.F. also was being a bit aggressive in some amorous advances which caused the victim to say to D.F., "... that he's going to be a rapist one day." NT at 11. While at the rear of the victim's house the victim's cell phone rang but she could not answer it because the juvenile retained possession of the device. Eventually, the victim regained possession of her phone from the juvenile and realized that her cousins had been trying to call her on her cell phone. She and the juvenile then returned to the front of the house where her cousins were located. NT at 10-12.

The pair then walked around the neighborhood for a little while. Eventually, D.F. grabbed the young woman's cell phone again and held it in a manner that rendered the victim incapable of retrieving it. NT at 13. D.F. told her he would relinquish it if she would walk to the corner to his deceased aunt's house. Id. at 14. She agreed and, while he again relinquished the phone to her, D.F. grabbed her hoodie-type jacket in the back and was able to control her movements. NT at 14-15. D.F. asked the young lady if she wanted to see his house and while she said something like, "... no, not really...." Nevertheless, he took her to the rear of a house where they went toward an enclosed porch. NT at 16. His effort to enter the enclosed porch was thwarted by its

locked door. NT at 16-17. While still gripping the victim's jacket, the juvenile then put his hand down the front of the victim's pants and inserted a finger into her vagina. NT 17-18. The victim testified that his finger in her vagina felt horrible and painful. NT at 18.

With his fingers still inside her vagina, D.F. then maneuvered the victim to a parked car that was three to five steps away from the porch. NT at 19. She explained that he had "probably like one, maybe two [fingers inside her]" as she "was walking/being dragged." NT at 78. When asked on cross examination if it was like having her feet dragged on the floor, she responded "No, no, but I had to walk. ... If I stopped there, my vagina was going to get scratched up. Me walking, but it still got scratched up. NT at 78. In follow-up juvenile's counsel asked, "So he's dragging you a couple of steps with his fingers inside of you, you say your vagina – you – he's hurting your vagina and you do nothing to stop him?" Her reply: "Right." NT at 79-80.

The victim described the situation as she was positioned at the car: "He [D.F.] kind of had me like you—I'm going to say like it almost felt as if I was getting arrested. That's how I'm going to say, like I was getting arrested, but like face down kind of. Like myself was on the car." NT at 20. The juvenile bent the victim over the car, pulled her pants down and inserted his penis into her vagina. NT at 20-21. In offering details as to her position with respect to the car, the victim said, "So I'm going to say the back of the car. I think it was the back of the car. My – the top of my body is laying down flat on the back of the car on the trunk. I don't got enough leg room or

nothing. I can't move back. We were so tight together. I can't – I couldn't do nothing. NT at 28.

The victim was also questioned concerning physical evidence: her pants. She said that the zipper to her pants were not broken before her encounter at the back of the car and that it had to have been broken while D.F. pulled her pants down. NT at 30 & 84. In describing the continuing event, the victim testified:

> A. After he did – after he inserted himself into me, within me – I was just like I didn't like it . Like I didn't like it. I been – I told him that I didn't want to be there. I wanted him to stop. I wanted to go home. I wanted to be with my cousin, Catherine, my little sister, do you feel me? And that's when I was like, I'll do anything for you to get off me. ... And then he said okay. And that's when he kind of like forced me to – this is uncomfortable, suck his penis should I say?
> Q. Okay. How – well let me, let me – you said to him, I'll do anything for you to get off me?
> A. Yes.
> Q. At that point, did he still have his penis in your vagina?
> A. Yes.
> Q. Okay. Did he take his penis out of your vagina then?
> A. Yes.
> Q. Okay. And did he turn you around or how did you – how did he get you into the position where you were?
> A. Because I kind of like turned, kind of turned. Like he didn't force me to turn, he didn't turn me, like physically turn me around.
> Q. Okay.
> A. But he kind of like when I got up, he kind of like not spun me, but he kind of like pulled me a little bit and then I put his...
> Q. How – you just went like this, so did he use his hand to push you down?

A. Yeah, he used his hand.
Q. Okay. And what part of your body did he touch with his hand?
A. My head.
Q. He put his hand on your head and pushed you down?
A. Yes.
Q. Okay. And did he — so your head was near his penis. Correct?
A. Correct.
Q. Did he force you to put his penis into your mouth?
A. Yes.

NT at 22-23.

The victim's cousin (who resides with the victim) and who saw the two walk away together, testified that the victim returned to the home upset and crying. NT 124. The cousin found the victim behind a locked door and when she was admitted, the cousin asked what was wrong and inquired whether D.F. had done something to her. NT at 125-26. The question amplified the victim's tears. NT at 125-26. Finally, the victim offered an explanation; an explanation that corroborated much of what was presented during the victim's testimony. This witness' offerings were credible and beyond reproach. NT at 126-27.

III. Attributes of Review

Initially, we note that our supreme court has clarified the post-disposition handling status of juvenile cases in the absence of a legislative mandate. It has been determined that appeals in delinquency proceedings should track the appellate rules. See *In re the Interest of D.S.*, 614 Pa. 650, 655-58, 39 A.2d 968, 971-73 (2012) (discussion of specific, post-adjudication procedural issues related to juvenile

delinquency cases). In evaluating the sufficiency of the evidence in this juvenile

proceeding:

> ... all the evidence admitted at trial, together with all reasonable inferences therefrom, [are considered] in the light most favorable to the Commonwealth, [to determine if the court] ... could have found that each element of the offense[s] charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt. This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Moreover, it is the province of the [court] ... to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. [As the trial court is t]he factfinder [, it] is free to believe all, part or none of the evidence. The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the ... [juvenile]'s innocence, but the question of any doubt is for the ... [trial court] unless the evidence be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

*In re T.B.*, 11 A.3d 500, 504 (Pa.Super. 2010) *quoting* **Commonwealth v. A.W.C.**,

951 A.2d 1174, 1177 (Pa.Super. 2008).

Juvenile's counsel posits a post-disposition motion which also questions the

weight of the evidence. Identical standards apply in delinquency proceedings and cases

involving adults. *In re J.B.*, 69 A.3d 268, 278 (Pa.Super. 2013).

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Commonwealth v. Widmer**, 560 Pa. 308, 319, 744 A.2d 745, 751–52 (2000); **Commonwealth v. Brown**, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. **Widmer**, ... at 319–20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.' " *Id.* at 320, 744 A.2d at 752 (citation omitted).

> It has often been stated that 'a new trial should be awarded when the [fact-finder's] verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.' *Brown*, 538 Pa. at 435, 648 A.2d at 1189.

*In re J.B.*, *supra* at 277. This court's reconsideration of its own decision-making, in rendering a decision on the weight of the evidence does not presuppose a purposeless process. In the context of a delinquency proceeding's bench trial (where the trial court saw and heard the witnesses and the presentation of other evidence), the trial court's exercise of its review discretion "imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law...". *See Widmer*, *supra* at 322, 744 A.2d at 753 (quotation omitted). *See also Commonwealth v. Clay*, ___ Pa. ___, ___, 64 A.3d 1049, 1055-56 (2013)(contrast between appellate court review of the weight of the evidence and trial court review).

With these considerations in mind we assess the issues at hand.

IV. Sufficiency of the Evidence.

While the juvenile's Post Disposition Motion speaks generally in terms of sufficiency of the evidence, the only focus rests upon the rape charge. We limit our discussion accordingly. The substance of the charge in pertinent part follows:

> **Rape**
> A person commits a felony of the first degree when he engages in sexual intercourse with another person not one's spouse:
> (1) by forcible compulsion;
>
> (2) by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

....

18 Pa.C.S.A. § **3121**. The victim of a rape need not resist. 18 Pa.C.S.A. § 3107 (Resistance not required). "[T]he force necessary to support a conviction of rape . . . need only be such as to establish lack of consent and to induce the [victim] to submit without additional resistance . . . . The degree of force required to constitute rape is relative and depends on the facts and particular circumstance of the case." *Commonwealth v. Rhodes*, 510 Pa. 537, 554, 510 A.2d 1217, 1226 (1986)(comprehensive discussion of the contours of "forcible compulsion") (citations omitted).

In contrast to the above, juvenile's counsel directs our attention to a case where the appellate court focused on the victim's decision-making in succumbing to another's sexual overtures. *Commonwealth v. Mlinarich*, 518 Pa. 247, 542 A.2d 1335 (1988). The juvenile's counsel asserts that *Mlinarich* "implicitly" dictates when there is lack of consent, but no showing of physical force, threat of physical force, or psychological compulsion, there is no forcible compulsion.

In *Mlinarich*, the accused's wife volunteered to assume custody of a neighbor's daughter after the young girl had been committed to a detention home for previous misconduct at her father's home. *Id.* at 249-50, 542 A.2d 1336-37. The defendant began to take liberties with the troubled teen when his wife was not at home. *Id.* at 250-51, 542 A.2d 1337. He told the girl that if she failed to cooperate with his demands for sexual intercourse, he would have her returned to the detention home. While the young girl protested and apparently experienced pain during these events, no

evidence presented reflected actual physical resistance or defendant's employment of force. *Id.* at 250-51, 542 A.2d 1337.

Juvenile's counsel's misplaced reliance offers no refuge for D.F.'s conduct. The *Mlinarich* record lacked evidence of any other threat, force or compulsion as the prelude to a sexual encounter. This is not, as argued by juvenile's counsel, a situation where the juvenile employed verbal means to pressure or manipulate his vulnerable victim during the encounter. Her will and corporeal autonomy were overborne by the juvenile's menacing actions from which she had no escape or relief other than through submission.

The young victim offered a detailed explanation of events. Here, the victim was compelled by the juvenile to travel to the rear of a home (both through his vise-like grip of the victim's clothing and his persisting insertion of his fingers into her pudendum). The victim explained that the digital component actually induced pain. Then, the juvenile's actions made the victim feel as if she were physically handled (in being bent over the rear of a car) as if she was subject to an arrest. While the articulation is subject to some interpretation, this court viewed that testimony of a young person as indicative of a level of compulsion well beyond acquiescence (as in *Mlinarich*) to another's verbal statements. The physical evidence, the damage to the victim's zipper and her testimony regarding the mechanism of the damage further revealed an application of unwanted physical power. Combined, these showed that the juvenile acted as an assailant and employed force to achieve his sexual depredation. These factual distinctions draw a clear line between the circumstances in the two situations.

Moreover, while D.F.'s counsel's argument seeks this court's endorsement of *Mlinarich* as the latest and current word on the issue of forcible compulsion, we recognize that *Mlinarich* is not only limited by its factual circumstances, but as a plurality decision, it lacks precedential effect as to other cases[1]. *See **Commonwealth v. Bethea**,* 574 Pa. 100, 111, 828 A.2d 1066, 1073 (2003)(the result of a plurality decision carries precedential weight only as between the parties)(citation omitted). *See also **Commonwealth v. Henry**,* 550 Pa. 346, 365-66 n.6, 706 A.2d 313, 322 n.6 (1997) (only where other opinions agree with decisional language in plurality opinion as to the reasoning compelling the result shall such language be accorded binding precedential effect).

The continued efficacy of *Mlinarich* must also be considered in an historical context. Both that decision and *Berkowitz*[2] triggered significant action in the state legislature. Ultimately, several changes were made to overhaul the statutory scheme for sex crimes. *See generally* Note, 40 Vill.L.Rev. 193, 216-19 (1995). In 1995, as part of a special legislative session, the General Assembly clearly altered the legal landscape by providing a definition for "forcible compulsion": "Compulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied. The term includes, but is not limited to, compulsion resulting in another person's death, whether the death occurred before, during or after sexual intercourse." *See* 18

---

[1] Our attention has also been directed to another case which juridically distanced itself from *Mlinarich* based on its split decision. *Commonwealth v. Berkowitz*, 415 Pa.Super. 505, 517 n.4, 609 A.2d 1338, 1344 n.4 (1992)(recognizing *Mlinarich* as a "non-binding precedent"). In spite of this, the *Berkowitz* decision eventuated in the discharge of the rape conviction based upon a finding that the record did not support a finding of "forcible compulsion." *Id.* at 524-25, 609 A.2d 1347-48, *aff'd* 537 Pa. 143, 152-53, 641 A.2d 1161, 1166 (1994).
[2] *See* footnote 1, *supra*.

*See* 18 Pa.C.S.A. § 3101 (effective May 31, 1995 – Senate Bill 2). Upon passage of the 1995 amendments, Senator Mellow, a cosponsor of the Senate bill, remarked:

> The important thing with this piece of legislation is that it closes a very important loophole that was pointed out to us by the Pennsylvania Supreme Court, because in Pennsylvania we should have the very clear understanding to anyone who wants to commit the violent crime of rape that in Pennsylvania "no means no" and the Senate Bill No. 2 will accomplish that.

Sen. Leg. J. 24 (Jan. 31, 1995).

While the facts presented demonstrably distinguish the juvenile's situation from that offered in *Mlinarich* (and *Berkowitz*), these other matters also serve as reminders that our analysis cannot be undertaken carelessly or without concern for all the details. The evidence clearly and adequately described the juvenile's restraint of the victim during intercourse and his use of force or the threatened use of force against the victim in bringing her to a remote location and in situating her for the sexual act. For the above reasons, we are satisfied, beyond a reasonable doubt, that the elements of the Rape charge were firmly established by the evidence presented. Thus, the challenge to the sufficiency of the evidence fails.

The court acknowledges that juvenile's counsel did a fine job in finding areas of cross-examination to identify potential weak points in the victim's testimony. The juvenile's representative emphasized points where the victim confessed a lack of recollection or a clear explanation of how certain specific events occurred. Nevertheless, counsel was unable to shake the victim's certitude demonstrated on the precise points that established the elements of rape. Nor was counsel able to cause the court to find that the young woman was engaged in a prevarication. This court felt that

the victim outlined sufficient details, in a believable fashion such that the elements of the crimes were established.

## V. Weight of the Evidence.

The previously referenced standard for assessing the weight of the evidence calls upon this court to consider whether the decision deviates so significantly from the evidence such as to "shock one's sense of justice."

Again, we will look to **Mlinarich** as the basis for evaluation. Certainly this is not the equivalent of **Mlinarich** where the victim could have made "... a deliberate choice to avoid the encounter even though the alternative may have been an undesirable one." The victim here had no choice and no options. She was cornered and, absent any ability to retreat, the juvenile forced himself upon the girl in the most despicable way. As noted in **Mlinarich**, the critical distinction rest upon a finding of volition. In **Mlinarich**, the victim possessed the ability to make a decision. If she elected against the desire of the perpetrator, she faced undesirable potential consequences (i.e. a threatened return to a juvenile facility). But, a choice (albeit a Hobson's choice), was available. Here, the involuntariness of the victim's submission is patent. The juvenile used his size and presence to prevent her from doing anything but acquiescing to his odious overtures. These facts meet the objective standard, beyond a reasonable doubt, to establish the degree of compulsion sufficient to establish the element necessary to support a charge of rape and a finding of delinquency against D.F.

The evidence offered allows no place for the court's conscience to be shocked. Quite the contrary, we harbor no hesitation in confirming that the evidence evinced the juvenile's delinquent act.

## V. Conclusion.

Our rigorous review of the record engendered by this appeal has only reconfirmed the rightness of our original result. For that reason, the Juvenile's Appeal should be denied.

BY THE COURT:

NATHANIEL C. NICHOLS,
J.

DELAWARE CO. PA
JUVENILE COURT

2014 APR 17 AM 11:26

MINUTED