2016 PA Super 198

| | |
|---|---|
| IN THE INTEREST OF: J.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.B. | |
| | No. 980 WDA 2015 |

Appeal from the Dispositional Order Entered May 18, 2012
In the Court of Common Pleas of Lawrence County
Juvenile Division at No: 113 of 2011

BEFORE:  OLSON, STABILE, and MUSMANNO, JJ.

OPINION BY STABILE, J.:                    **FILED SEPTEMBER 1, 2016**

Appellant, J.B., appeals from the May 18, 2012 order of disposition. We affirm.

This action arises from the February 20, 2009 murder of K.M.H. (the "Victim"). On that date, the Victim was engaged to and living with C.B., Appellant's father, in a rented two-story farmhouse situated near wooded areas and farmland in Wampum, Pennsylvania. Appellant (then 11 years old) and the Victim's two daughters, J.H. (then age 7) and A.H. (then age 4) also lived in the house. The Victim was eight months pregnant.

A light snowfall covered the ground that morning. C.B. left for work at 6:45 a.m. and arrived around 7:00 a.m. N.T. Adjudication Hearing, 4/11/2012 at 146-47. State police subsequently confirmed that C.B. was at work during the commission of the crime and C.B.'s hands tested negative

for gunshot residue. *Id.* at 63, 82, 138, 147. Police quickly eliminated C.B. as a suspect.

In preparation for their new baby, C.B. and the Victim were trading bedrooms with Appellant. They were relocating their belongings from their first floor bedroom to Appellant's upstairs bedroom. The upstairs bedroom adjoined a smaller bedroom the couple intended to use as a nursery. Appellant was moving to the first floor bedroom. N.T. Adjudication Hearing, 4/10/2012 at 95, 108; N.T. Adjudication Hearing, 4/11/2012 at 68-69. On the morning of the murder, Appellant had to go downstairs to get dressed because his clothes had been moved to the first floor bedroom. N.T. Adjudication Hearing, 4/11/2012 at 68-69.

Appellant gave a statement to Trooper Janice Wilson, of the Pennsylvania State Police, describing his actions on the morning of the murder. Appellant said he awoke in the upstairs bedroom, retrieved clothes from the downstairs bedroom, and dressed in a downstairs bathroom. *Id.* at 69. Once he was dressed and ready, Appellant and J.H. sat on the couch watching television. *Id.* A.H. was still asleep. *Id.* at 66. Appellant heard the Victim click her cell phone either open or shut, presumably to check the time. *Id.* at 69-70. According to Appellant, the Victim told him and J.H. to leave or they would miss the bus. *Id.* at 70. Appellant and J.H. left the house at 8:13-8:14 a.m. *Id.* at 89. As Appellant traversed the driveway, he noticed a large black truck parked by the garage. *Id.* at 65-66.

- 2 -

The school bus driver testified that Appellant and J.H. were about a third of the way down the driveway as the bus approached, with Appellant leading J.H. by about ten yards. N.T. Adjudication Hearing, 4/10/2012 at 152. Normally, they were halfway or three quarters of the way down their long driveway as the bus approached. *Id.* at 151. As the children ran toward the bus, the driver did not observe either child stray from the driveway or discard anything. *Id.* at 153-56. Appellant and J.H. took their assigned seats and exhibited no unusual behavior. *Id.*

Just after 9:00 a.m., a tree service crew arrived at the residence to collect firewood purchased from the property owner. *Id.* at 13-14, 19, 150. The driveway was the only way in or out of the property by vehicle. *Id.* at 42; N.T. Adjudication Hearing, 4/11/2012 at 147. The crew came in three trucks, with Steven Cable's truck in the lead. N.T. Adjudication Hearing, 4/10/2012 at 14, 20. Cable, the owner of the tree service, observed a light coating of snow on the driveway approximately 1/8 to 1/4 of an inch in depth. *Id.* at 20. Cable did not observe any tire tracks in the driveway. *Id.* at 17, 31. He did observe two sets of children's footprints in the center of the driveway. *Id.* at 21-22, 38. Shortly after the crew began its work, Cable noticed a little girl (A.H.) at the door crying. *Id.* at 23. As Cable approached, A.H. told him "her mother was dead." *Id.* at 25. Cable was unable to reach the property owner to get permission to enter the residence,

so he called 911. *Id.* at 25. Cable remained at the door with A.H. until police arrived. *Id.* at 26.

Trooper Harry Gustafson and Corporal Jeremy Bowser of the Pennsylvania State Police arrived at 10:13 a.m. *Id.* at 43-46. Trooper Gustafson entered the house and observed the Victim lying on her left side in a large pool of blood on the bed in the first-floor bedroom. *Id.* at 49, 71. The cause of the injury was not immediately apparent, but the Victim was obviously dead. *Id.* at 49-50. Trooper Gustafson immediately summoned paramedics. While awaiting their arrival, Trooper Gustafson and his partner took turns using a valve mask in an attempt to get air to the unborn baby. *Id.* While that effort was ongoing, Trooper Gustafson heard A.H. talking. *Id.* at 59. Trooper Gustafson investigated and found A.H. talking on a cell phone. *Id.* Trooper Gustafson asked A.H. for the phone and spoke to the caller. *Id.* at 59-60. It was the Mohawk Elementary School nurse calling the Victim to inform her that Appellant was ill and wanted to come home. *Id.* at 59-60. Trooper Gustafson identified himself, explained that he was investigating a serious situation, and asked the nurse to keep Appellant at school until police could arrange for someone to pick him up. *Id.* at 60.

The paramedics arrived at 10:40 a.m. Their examination revealed a gunshot wound to the back of the Victim's neck. *Id.* at 82, 85. Neither the Victim nor her unborn child displayed any vital signs. *Id.* at 81. Paramedics

notified the coroner's office, and the Victim and her unborn child were pronounced dead. *Id.* at 81.

Corporal Andrew Pannelle of the Pennsylvania State Police Forensic Services Unit testified that he arrived at the scene around noon, and, after obtaining a search warrant, he examined the interior and exterior of the residence. *Id.* at 89-90. As Corporal Pannelle did an initial walk through of the residence for security purposes, he observed the Victim lying on the bed in the first floor bedroom. *Id.* He testified that he did not notice any signs of forced entry or signs of a struggle in the residence. *Id.* at 93. Corporal Pannelle did not notice any obvious evidence outside the residence. *Id.* at 96-97. Corporal Pannelle testified that all of the doors to the house were unlocked. *Id.* at 124. He opened the doors to the armoire in the first floor bedroom and found a gun safe on the bottom shelf, containing two handguns and ammunition. *Id.* at 103. On the top shelf, he found a work helmet and two boxes of shotgun shells—one opened and one closed. *Id.* at 104. The open box contained sixteen unfired rounds of Federal Premium Wing-Shok .20 gauge shotgun ammunition. *Id.* at 104-06.

Sergeant Ken Markilinski, also of the Pennsylvania State Police, accompanied Corporal Pannelle to examine the second floor of the residence. They found six long guns in Appellant's upstairs bedroom, partially covered by an orange cloth. *Id.* at 108-109. One of the guns, a Harrington and Richardson youth model .20 gauge shotgun, smelled as if it had been freshly

fired. *Id.* at 113, 130-131, 142. It had gunpowder residue in the breech. *Id.* at 141. Based on his personal experience as a hunter for over forty years and as a twelve-year participant in a skeet shooting league, Sergeant Markilinski testified that the odor and presence of residue indicated to him that the weapon had been fired "within recent hours." *Id.* at 141-142. The odor of burnt gunpowder was "still pungent," and Sergeant Markilinski was able to wipe away some of the residue with his finger because the residue did not have time to harden. *Id.* at 142. Sergeant Markilinski said it is possible for the odor of burnt gunpowder to remain on a gun for up to a day. *Id.* at 144. The Commonwealth did not offer Sergeant Markilinski as an expert witness. *Id.* at 144.

Trooper Wilson attempted to speak with A.H. at the scene, but she was in a state of shock and incapable of answering questions. N.T. Adjudication Hearing, 4/11/2012 at 60-61. At approximately 12:00 p.m., Trooper Wilson went to Mohawk Elementary School to interview J.H. and Appellant. Trooper Wilson testified that, during a ten-minute interview J.H. "really didn't have much to offer about what had happened that morning." *Id.* at 64. J.H. was "very, very distraught" when Trooper Wilson first arrived, but she calmed down when told she was not in trouble. *Id.* J.H. and A.H. did not testify at the adjudication hearing.

After J.H.'s interview, Trooper Wilson interviewed Appellant in a conference room in the presence of the school guidance counselor. *Id.*

Appellant had been sleeping in the nurses office, but he was responsive during the interview. *Id.* at 65. Trooper Wilson, without informing Appellant of the death of the Victim, asked him who was at the residence that morning. Appellant stated that the Victim, J.H., and A.H. were the only other persons present after C.B. left for work. *Id.* at 65-66. Appellant stated that that A.H. was still asleep when he and J.H. left for school. *Id.* Appellant also saw a "black, large pickup truck parked back by the garage" as he was walking down the driveway to catch the school bus. *Id.* at 66. When Trooper Wilson asked for more details about the black truck, Appellant said he did not know if it was running, and he did not see anyone inside. *Id.* Appellant said the truck was the same kind as the property owner and another man used when they came to feed cows. *Id.* at 66-67. Appellant also described his own actions that morning, as we have already set forth above.

The night before the murder, Adam Harvey, the Victim's ex-boyfriend, was escorted out of a nightclub after having a verbal altercation with the Victim's parents. *Id.* at 126. He testified that he subsequently went back to his parents' house, where he was living in the basement. *Id.* at 211-12 Harvey claimed he remained at his parents' house through the following morning. *Id.* at 133, 212.

At the time of the murder, Harvey had an enforceable Protection From Abuse ("PFA") order against him, naming the Victim and her family

(including her parents, sister, and brother-in-law) as persons to be protected. *Id.* at 131, 205. The PFA, enforceable from March 2008 to March 2011, was entered after Harvey allegedly threatened to kill the Victim and her family. *Id.* at 200, 202, 204. Although Harvey did not appear in court to contest the PFA, he testified at the adjudication hearing that the allegations were false. *Id.* at 200-06. The Victim had previously filed a PFA petition against Harvey in 2006, after he allegedly abused and threatened to have her killed. *Id.* at 194. Harvey denied those allegations at the adjudication hearing. *Id.* at 195-96. In early 2009, a DNA test confirmed that Harvey was not A.H.'s father. *Id.* at 127, 206. Harvey testified that he was prepared for that result and was only "a little bit" upset about it. *Id.* at 207. Harvey knew the Victim lived somewhere in Wampum, but denied knowing the location of the Victim's house. *Id.* at 210.

At 1:20 p.m. on the day of the murder, Pennsylvania State Police Trooper Dominick Caimona found Harvey in his black Ford F-150 pickup truck at an intersection approximately two blocks from Harvey's parents' house. *Id.* at 131, 189, 221-22. This intersection was approximately eight to ten miles from the Victim's house. *Id.* at 223. Trooper Caimona testified that the snow on the hood and roof of the truck would not have remained had Harvey driven it to Wampum and back. *Id.* at 223. Harvey accompanied Trooper Caimona to the police station. Harvey's hands tested negative for gunshot residue, and a search of his truck produced no

incriminating evidence. *Id.* at 132, 137. Based on his alibi, the snow on his black truck, and the absence of other incriminating evidence, police eliminated Harvey as a suspect.

At 10:00 p.m. on the day of the murder, Trooper Wilson interviewed Appellant a second time, this time in the presence of C.B. *Id.* at 72. Before the interview commenced, C.B. told Appellant something bad had happened to the Victim and that she was in heaven. *Id.* Appellant cried for approximately thirty seconds, but did not ask questions. *Id.* After he stopped crying, Wilson asked Appellant for more details about the truck he had seen that morning. *Id.* at 73. Appellant stated that after leaving the house, he checked his pocket for ice cream money and accidentally dropped a piece of fuzz onto the ground. *Id.* After bending down to pick up the fuzz, he saw the truck. *Id.* Appellant said he told J.H. about the truck, but he did not think she heard him because she was too far down the driveway ahead of him. *Id.* at 74. Appellant also stated that he saw a person wearing a white hat "ducking over" inside the truck, and that the lights were "sort of half on." *Id.* at 75. Appellant did not mention these observations in his initial interview with Trooper Wilson. *Id.* at 76. Trooper Wilson confirmed that a man who tends the cattle on the farmland adjacent to the house drives a large dark truck. *Id.* at 100. Trooper Wilson also asked Appellant if he had any guns, and Appellant replied that he had a .30-30. *Id.* at 76. Trooper Wilson asked Appellant if he had a shotgun. Appellant said that he

had a .20 gauge and volunteered that he only shot it outside. *Id.* at 76-77, 101. Trooper Wilson asked Appellant if he fired his .20 gauge that morning. He said "no," hesitated, and then said "no" again. *Id.* at 78.

On February 21, 2009 at 3:30 a.m., police arrested Appellant and charged him with two counts of criminal homicide. N.T. Adjudication Hearing, 4/10/2012 at 217. At the time of the arrest, police collected the shirt, jeans, tennis shoes, and winter coat Appellant wore on the day of the murder. *Id.* at 217-218. Later that day, Sergeant Daniel Brooks of the Pennsylvania State Police searched the exterior of the residence for shotgun shells or other potential evidence. *Id.* at 195, 207. In addition to two rusty shell casings in the yard found by other officers, Brooks found a spent "Federal 20-gauge No. 6 shot" shell casing in "pristine" condition by a fence along the side of the driveway. *Id.* at 195-96, 201. Sergeant Brooks found the shell approximately 100 feet from the house, closer to the house than the road. *Id.* at 196-97. The pristine shell—found amongst some icy leaves—was near the top third of the driveway, approximately 100 yards from the residence. *Id.* at 196-97, 202, 210.

Trooper David Burlingame, a certified firearm examiner, inspected Appellant's .20 gauge shotgun, the pristine shotgun shell, and the twenty-seven shotgun pellets and pieces of wadding recovered from the body of the Victim. N.T. Adjudication Hearing, 4/11/2012 at 30-31, 36. Trooper Burlingame testified that the .20 gauge was functional. *Id.* at 38-40.

Trooper Burlingame used Appellant's shotgun to test-fire one of the unspent .20 gauge shells found in the armoire, and he compared the test-fired shell with the pristine shell recovered near the driveway. *Id.* at 42-43. The markings on the two shells were identical, leading Trooper Burlingame to conclude that the pristine shell had been fired from the Appellant's .20 gauge shotgun. *Id.* at 44. Trooper Burlingame compared the twenty-seven shotgun pellets and pieces of wadding recovered from the Victim's body to pellets and wadding in one of the unspent .20 gauge shells recovered from the armoire. The size, shape, weight, and construction details of the pellets in the unspent shell were consistent with the pellets removed from the Victim's body. *Id.* at 44-45. The wadding also was consistent with wadding retrieved from the victim's body. *Id.*

Forensic expert Elana Somple examined Appellant's clothing for gunshot residue. She explained that when a firearm discharges, the firing pin strikes the primer cap of the ammunition, causing the primer components within—lead, barium, and antimony—to ignite. *Id.* at 8. The vaporized lead, barium, and antimony solidify and form particulate, some of which lands on the hands and clothing of the person who discharged the firearm. *Id.* at 9. Particulate with all three components fused together conclusively establishes the presence of gunshot residue. *Id.* at 8-9. Particulate with two of the three components is considered to be consistent with gunshot residue. *Id.* at 10. One-and two-component particles could

come from a gunshot or from other sources. *Id.* Gunshot residue can get on clothing when the wearer discharges a firearm or stands in close proximity to a person discharging a firearm. *Id.* at 10, 12, 21. In addition, clothing can have gunshot residue on it if it comes into contact with another object that has gunshot residue on it. *Id.* Somple said that gunshot residue has a lasting presence on clothing if the clothing is not disturbed. *Id.* at 23. Somple also said she would expect to find more gunshot residue on someone who discharged a firearm indoors than someone who discharged a firearm outdoors. *Id.* at 28.

Somple tested Appellant's shirt and pants and found one conclusive particle of gunshot residue on the right front side of the shirt and one conclusive particle on the left leg of his jeans. *Id.* at 15, 17-18. Additionally, she found 14 two-component particles and at least 14 one-component particles on the right front side of the shirt. *Id.* at 15. Somple found 17 two-component particles and at least 15 one-component particles on the left front side of the shirt. *Id.* Somple found six two-component particles and at least 29 one-component particles on the right leg of the jeans. *Id.* at 18. Somple found 11 two-component particles and at least 29 one-component particles, in addition to the one conclusive particle of gunshot residue, on the left leg of the jeans. *Id.*

Corporal Jeffrey Martin testified that Appellant's clothing tested negative for the presence of blood stains and that no DNA or fingerprints

were found on the spent shotgun shell. *Id.* at 121, 123-24. Forensic testing revealed no latent fingerprints or blood on the shotgun. *Id.* at 122-23.

Forensic pathologist Dr. James Smith performed the Victim's autopsy. N.T. Adjudication Hearing, 4/10/2012 at 157. The only trauma on the Victim's body was a single gunshot wound to the back of her neck. *Id.* at 160. The wound was produced by a shotgun. *Id.* at 161. Dr. Smith opined that the shotgun was within a few inches of or touching the Victim's neck when fired. *Id.* at 185. When asked whether "blowback"—blood or tissue traveling from the Victim to the shotgun barrel—occurred, Dr. Smith said blowback was possible but the angle at which the blast occurred would have minimized the amount. *Id.* at 170-72, 186-190. Asked if he would "necessarily expect to find blood or tissue on the barrel of the gun," Dr. Smith said "[n]ot necessarily, no." *Id.* at 170-71.

C.B. testified that he, the Victim, Appellant, and the Victim's daughters had a close relationship. N.T. Adjudication Hearing, 4/11/2012 at 140, 141. According to C.B., Appellant's relationship with the Victim was "[j]ust as normal as it was between her and her own daughters." *Id.* C.B. explained that he and Appellant frequently shot guns in front of the house, near where Cable and his work crew parked on the morning of February 20, 2009. *Id.* at 142. The week before the murder, C.B. and Appellant participated in a turkey shoot at which Appellant wore the winter coat seized after his arrest.

*Id.* at 143, 146. Appellant used the .20 gauge shotgun in the turkey shoot, but C.B. loaded it and unloaded it for him. *Id.* at 145.

When asked about potential suspects, C.B. told police he believed Harvey would kill the Victim *Id.* at 148. C.B. testified that he had listened to ten to twelve voicemails Harvey left on the Victim's cell phone, in which Harvey threatened the Victim and her family. *Id.* at 149. C.B. further noted that the Victim feared Harvey, and that he and the Victim had an unlisted phone number in order to prevent Harvey from contacting them. *Id.* at 148-49, 177.

Appellant's adjudication hearing commenced on April 10, 2012. On April 13, 2012, the juvenile court adjudicated Appellant delinquent on counts of homicide and homicide of an unborn child.[1] At the conclusion of a dispositional hearing held on May 18, 2012, the juvenile court committed Appellant to a secured residential treatment facility. Appellant did not file a post-dispositional motion. Instead, he filed a timely appeal from the dispositional order.

On May 8, 2013, this Court vacated the dispositional order, finding merit in Appellant's argument that the juvenile court's verdict was contrary to the weight of the evidence because the juvenile court's adjudication of delinquency rested in large part on findings of fact not supported in the

_____

[1] 18 Pa.C.S.A. §§ 2501(a) and 2603(a), respectively.

record. *In re J.B.*, 69 A.3d 268, 282 (Pa. Super. 2013), *vacated*, 106 A.3d 76 (Pa. 2014). Specifically, we found no record support for the juvenile court's factual findings in support of its conclusion that no one entered the residence between Appellant and J.H.'s departure and the arrival of state police. *Id.* at 278-81. Prior to addressing the merits, we concluded Appellant's failure to file a post-dispositional motion did not result in waiver of his challenge to the weight of the evidence. *Id.* at 274-77.

On December 15, 2014, our Supreme Court vacated this Court's decision. *In re J.B.*, 106 A.3d 76 (Pa. 2014). The Supreme Court concluded a post-dispositional motion was necessary to preserve Appellant's challenge to the weight of the evidence, and remanded to the juvenile court to permit Appellant to file a post-dispositional motion *nunc pro tunc. Id.* at 98-99. On January 16, 2015, Appellant filed a motion challenging both the sufficiency and weight of the evidence in support of Appellant's conviction. The juvenile court permitted the parties to file briefs, and the court conducted a hearing on the motion on March 15, 2015. The juvenile court denied Appellant's motion on May 19, 2015. This timely appeal followed.

Appellant presents three questions for review:

1. Did the juvenile court err in finding that the evidence adduced at trial, when viewed in the light most favorable to the Commonwealth as the verdict winner, was sufficient to establish beyond a reasonable doubt that Appellant J.B. committed the crimes in question?

2. Did the juvenile court commit a palpable abuse of discretion in finding that Appellant J.B. committed the

crimes in question when the verdict was against the weight of the evidence introduced at trial?

3. Did the juvenile court err in making redeterminations of facts and reevaluating the credibility of witnesses in denying Appellant J.B.'s motion for post-dispositional relief?

Appellant's Brief at 7. We will address these arguments in turn.

We review Appellant's challenge to the sufficiency of the evidence as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brown*, 23 A.3d 544, 559-60 (Pa. Super. 2011) (*en banc*).

Criminal homicide occurs where the defendant "intentionally, knowingly, recklessly or negligently causes the death of another human being." 18 Pa.C.S.A. § 2501(a). The parties do not dispute that the

perpetrator intentionally caused the death of the Victim. The sole matter in dispute is whether Appellant was the perpetrator. Appellant argues (1) the juvenile court erred in finding that no one entered the residence in between Appellant's departure and the arrival of the investigating police officers; (2) the juvenile court erred in finding that the .20 gauge youth-model shotgun was the murder weapon; (3) the gunshot residue on Appellant's clothing does not prove Appellant fired his .20 gauge shotgun on the morning in question; and (4) the record contains no other evidence that Appellant handled the shotgun on the morning in question. Appellant's Brief at 16-30.

In the first of his sufficiency of the evidence challenges, Appellant relies on this Court's basis for vacating the dispositional order. In that opinion, we explained:

> In its written opinion, the juvenile court made clear that its decision depended in substantial part on its finding that [Appellant], his two step-sisters (J.H. and A.H.), and K.M.H. were the only people inside the residence on the morning of February 20, 2009, and that the evidence demonstrated that no other person entered the residence after the departure of [Appellant] and his seven-year-old sister and prior to the arrival of the Pennsylvania State Police. In its written opinion, the juvenile court found that '[t]he only imprints observed in the snow on that morning were the children's footprints leading from the house to the bus stop,' from which the juvenile court concluded that '[t]here is no indication that another person approached the residence, either by foot or in a vehicle after the children left and before [Cable] arrived with his employees.' Juvenile Court Opinion, 4/20/12, at 14. The juvenile court emphasized this point again, stating on the next page of its opinion that, in addition to forensic evidence, it 'especially considers the absence of any unaccounted for foot prints or tire tracks around the home, the time period after the arrival of

- 17 -

[Cable] and the tree service employees, during which no one was seen approaching or leaving the residence....' *Id.* at 15.

*J.B.*, 69 A.3d at 278–79. We found the juvenile court's findings unsupported because "[n]o witness (including any of the police officers first arriving on the scene) testified to observing an absence of footprints on the property that morning." *Id.* at 280.

In its post-remand opinion, the juvenile court no longer relies on the absence of evidence that any unidentified individual entered the residence. Juvenile Court Opinion, 7/29/15, at 5 ("In evaluating [Appellant's] post-trial motion, the court carefully reevaluated its own findings, and specifically excluded all conclusions that the Superior Court determined to be improperly made."). Rather, the court emphasized other evidence implicating Appellant:

> The testimony established that [Appellant] lived with the Victim. N.T. April 11, 2012, at 61-62. [Appellant] owned the Harrington and Richardson .20 gauge youth shotgun that was established to be the murder weapon. N.T. April 11, 2012, at 77-78. The Harrington and Richardson .20 gauge youth shotgun was discovered in [Appellant's] upstairs bedroom immediately after the crime, which smelled as if it had been recently fired. N.T. April 10, 2012, at 89, 111-114, 142. [C.B.] stated that all of the guns, including the Harrington and Richardson .20 gauge youth shotgun, were normally located in the bedroom he shared with the Victim. N.T. April 11, 2012, at 167. He elaborated that the guns were stored in a cubbyhole. *Id.* Only a day or two prior to the Victim's murder, the guns were moved upstairs by [Appellant] and J.H. *Id.* at p. 168. [C.B.'s] testimony established that even he did not know the guns were moved to another location in the residence prior to his fiancé's death. *Id.* at 167-169. From this testimony, the court infers that a limited group of people had knowledge of the murder weapon's location: the Victim, J.H. and [Appellant]. Additionally, [Appellant] had

access to the shotgun shells, as they were located in the Victim's bedroom, N.T. April 10, 2012, at 103-104, where [Appellant] had to go on the morning of the crime to retrieve his clothing. N.T. April 11, 2012, at 68-70. [C.B.] stated he had been teaching [Appellant] about gun safety, which included 'instructing [Appellant] on how to properly load and unload a gun.' N.T. April 11, 2012, at 143. [Appellant] knew how to fire a shotgun.

Forensic evidence established that [Appellant] had one gunshot residue particle and fourteen particles consistent with gunshot residue on the right side of his shirt. N.T. April [11], 2012, at 15. 18. On the left side of [Appellant's] jeans forensic experts found seventeen particles consistent with gunshot residue and fifteen particles consistent with any one of the three particles comprising gunshot residue. *Id.* at 15. The particles on [Appellant's] clothing correspond and are consistent in location with firing a shotgun. N.T. April [11], 2012, at 18. The shirt and jeans tested were the same articles of clothing [Appellant] was wearing when he left for school on February 20, 2009, and when he was later interviewed by Trooper Wilson. N.T. April 11, 2012, at 78-79. The Commonwealth established that one pristine shotgun shell was retrieved outside the residence along the drive near an adjacent fence line. N.T. April 10, 2012, at 195, 199. As opposed to two other rusted shotgun shells found outside the residence, this shell was apparently pristine and new. N.T. April 10, 2012, at 201. The fence line, along which the pristine shell was found, ran parallel to the driveway utilized by [Appellant] when walking to the bus stop. N.T. April 10, 2012, at 151-152. [Appellant] used this route on the morning of the crime. *Id.* These facts support the Commonwealth's argument that [Appellant] had the ability to discard the shotgun shell as he walked to the bus stop on the morning of February 20, 2009.

Juvenile Court Opinion, 5/19/15, at 39-41.

Concerning the possibility of an unidentified perpetrator murdering the

Victim after Appellant and J.H. left for school, the juvenile court reasoned as

follows:

The court's summary set forth above obviously establishes that there is an unaccounted for period of time, being the time between when the children left for school at 8:12 a.m. and when Mr. Cable and his crew arrived at 9:00 a.m. In order to impose fault on some unaccounted individual, the court would have to find that this person was able to enter the Victim's residence without disturbing any of the contents, the Victim or [A.H.], and retrieve the Harrington and Richardson .20 gauge youth shotgun from [Appellant's] bedroom along with the ammunition from the Victim's bedroom. After murdering the Victim, the gun would be replaced and the shotgun shell discarded along the driveway. This hypothetical characterization of the evidence is an unrealistic portrayal of the events[.]

*Id.* at 47.

In summary, the juvenile court did not rely on the absence of evidence of an unidentified assailant. The court's May 19, 2015 opinion relies on circumstantial evidence implicating Appellant. The court's July 29, 2015 opinion expressly disavowed any reliance on findings this Court deemed lacking in record support.

The May 19, 2015 opinion relies on facts supported in the record. Police believed Appellant's .20 gauge shotgun smelled freshly fired. Appellant denied having recently fired the .20 gauge shotgun. Police recovered a pristine shell under some leaves and ice near the driveway—which Appellant traversed on his way to the school bus on the morning of the murder. Forensic testing confirmed the pristine shell was fired from Appellant's shotgun. The record also confirms that Appellant's .20 gauge shotgun was moved to the upstairs bedroom only days before the murder, and that only Appellant, J.H., and the Victim knew the gun's location. The

.20 gauge ammunition remained downstairs in an armoire in the Victim's bedroom. Based on these facts, the juvenile court found it unrealistic that an unidentified assailant could have entered the residence, located Appellant's shotgun upstairs, located the ammunition in the armoire downstairs, murdered the Victim, replaced the shotgun upstairs, discarded the shell by the driveway, and left undetected. The juvenile court did not rely on the absence of any footprints or other evidence indicating the presence of a third party. The court found that the circumstantial evidence implicating Appellant also excludes any reasonable possibility of an unidentified assailant. We therefore reject Appellant's argument that the juvenile court relied on the absence of evidence that an unidentified assailant entered the house.

Next, Appellant argues that the trial court erred in finding that Appellant's shotgun was the murder weapon. Appellant notes, correctly, that Appellant and C.B. commonly shot guns near the residence. Thus, Appellant believes that the pristine shotgun shell recovered near the driveway is not noteworthy, especially since it could not be determined precisely how long the shell was there. Appellant concedes that the pellets retrieved from the Victim's body were consistent with the pellets from an unfired .20 gauge shell retrieved from the armoire, but argues that mere consistency of the pellets is insufficient to prove Appellant's shotgun was the murder weapon. Appellant also notes the absence of blood on or in the

shotgun's barrel, despite evidence that the barrel was close to or touching the Victim's neck when it was discharged. As explained above, Dr. Smith testified that the angle of the gun would have minimized blowback, i.e. blood or tissue attaching to the shotgun barrel. Appellant nonetheless contends that forensic analysis would have retrieved at least a minimal amount of blood or tissue on the shotgun barrel if it was the murder weapon. Likewise, Appellant believes the juvenile court erred because forensic analysis retrieved no fingerprints from the gun. Finally, Appellant notes that police could not testify with certainty how recently the shotgun had been fired.

Under the governing standard of review, which requires us to view the evidence in a light most favorable to the Commonwealth as verdict winner, we make the following observations. The record demonstrates that Appellant's .20 gauge shotgun—which had been recently moved and whose location was known only to Appellant, J.H. and possibly the Victim—was recently fired. Police located a pristine shell fired from Appellant's shotgun under leaves and ice along the driveway. It is impossible to prove conclusively that the pellets retrieved from the Victim were fired from the pristine spent shell. The record confirms, however, that the pellets and wadding retrieved from the Victim's wound were consistent with pellets and wadding from an unfired .20 gauge shell retrieved from the box of ammunition in the Victim's bedroom. As for the absence of forensic evidence, the record establishes that blowback was possible, but that it

would not necessarily occur because of the position of the gun barrel relative to the Victim's neck. This evidence does not command a finding that minimal blowback occurred. Furthermore, the absence of fingerprints on the gun supports a reasonable inference that the assailant wiped it clean. The presence of Appellant's fingerprints on his own shotgun would have been unsurprising and not necessarily incriminating. The total absence of fingerprints renders the gun suspicious, especially since it smelled as if it had been recently fired. Viewing the evidence in a light most favorable to the Commonwealth, we conclude the record supports the juvenile court's finding that Appellant's shotgun was the murder weapon.

Appellant also argues that the presence of gunshot residue on the clothing he wore on the day of the murder does not prove he fired a gun that morning. As explained above, the Commonwealth confiscated the coat, shirt, and jeans Appellant wore on the day of the murder. Appellant wore the coat to a turkey shoot the week before. Appellant relies on Somple, who testified that gunshot residue can transfer from one item to another on contact. The expert also testified that residue could remain on clothing for long periods of time if left undisturbed. The import of Appellant's argument is that the residue on Appellant's shirt and jeans could have transferred from the coat he wore to the turkey shoot.

As noted above, Appellant had conclusive three-component particles of gunshot residue on the right front side of his shirt and the left leg of his

jeans. Appellant had one- and two-component particles on both sides of his shirt and both legs of his jeans. The juvenile court found it unlikely that gunshot residue from Appellant's coat—assuming the coat still had residue from the turkey shoot the week before—would transfer to an inner layer of clothing. *Id.* at 47-48. We find the juvenile court's finding reasonable and supported by the evidence.[2]

In summary, we have considered and rejected Appellant's arguments that the evidence was insufficient. We conclude that the record, viewed in a light most favorable to the Commonwealth as verdict winner, supports the juvenile court's findings of fact. Viewed in that light, the record also supports the juvenile court's conclusion that Appellant was the perpetrator.

Next, we consider Appellant's weight of the evidence argument. As explained above, our Supreme Court remanded this matter to the juvenile court so that Appellant could present this issue in a post-dispositional

_____

[2] The juvenile court also opined that the location of the residue on Appellant's clothing was consistent with firing a shotgun while wearing those clothes. Juvenile Court Opinion, 5/19/15, at 40-41. The court cited Somple's testimony. Our review of Somple's testimony confirms only that she sampled the front side of Appellant's shirt (her testimony is not specific as to whether she sampled the front or back of the jeans). N.T. Adjudication Hearing, 4/11/2012, at 17. Somple did not testify that the location of the residue on the clothing was consistent with the wearer having fired a shotgun. The juvenile court presumably reached that finding because residue was on the front of Appellant's shirt. The court's finding is not unreasonable, but we need not rely on it to support our decision. As we explained in the main text, the record supports the juvenile court's finding that gunshot residue would not likely transfer from an outer layer of clothing to jeans or a shirt.

motion. Appellant did so, and the juvenile court denied relief. We must discern whether the juvenile court abused its discretion:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

> However, the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is not unfettered. The propriety of the exercise of discretion in such an instance may be assessed by the appellate process when it is apparent that there was an abuse of that discretion. This court summarized the limits of discretion as follows:

> The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000).

A challenge to the weight of the evidence is distinct from a challenge to the sufficiency of the evidence in that the former concedes that the Commonwealth has produced sufficient evidence of each element of the

crime, "but questions which evidence is to be believed." ***Commonwealth v. Charlton***, 902 A.2d 554, 561 (Pa. Super. 2006), *appeal denied*, 911 A.2d 933 (Pa. 2006). "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." ***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013). "Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." ***Id.*** (citation omitted). "It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Id.***

The Supreme Court has provided the following guidance for an appellate court's review of the record when the appellant challenges the weight of the evidence:

> In reviewing the entire record to determine the propriety of a new trial, an appellate court must first determine whether the trial judge's reasons and factual basis can be supported. Unless there are facts and inferences of record that disclose a palpable abuse of discretion, the trial judge's reasons should prevail. It is not the place of an appellate court to invade the trial judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function.
>
> To determine whether a trial court's decision constituted a palpable abuse of discretion, an appellate court must examine the record and assess the weight of the evidence; not however, as the trial judge, to determine whether the preponderance of

the evidence opposes the verdict, but rather to determine whether the court below in so finding plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the jury. Where the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion.

*Id.* at 1056.

Appellant's weight of the evidence argument spans only two paragraphs in his brief. Appellant's Brief at 31-32. In those two paragraphs, he simply asserts that the findings he challenged in his sufficiency of the evidence argument lack record support and, therefore, the adjudication of delinquency is contrary to the weight of the evidence. We already have set forth a detailed review of the record and explained our reasons for concluding that the record supports the juvenile court's findings. For the reasons we explained in addressing Appellant's challenge to the sufficiency of the evidence, we cannot conclude that the juvenile court's adjudication is so contrary to the evidence as to shock our sense of justice. *See Clay*, 64 A.3d at 1055.

We are cognizant that Appellant was only 11 years old at the time of the murder. In adjudicating Appellant delinquent, the juvenile court found that Appellant was able to murder the Victim and replace and wipe clean his shotgun while J.H. and A.H. were in the house, then discard the spent shell on his way to the school bus with J.H. The school bus driver noticed no unusual behavior from either child. The record is silent on whether or how Appellant explained the shotgun blast to the Victim's two young daughters.

The record also is silent on whether or how Appellant kept J.H. and A.H. out of the Victim's bedroom before he and J.H. left for school. No evidence reveals whether J.H. was aware of her mother's death before she left for school. We do not envy the juvenile court's difficult task of deciding whether an 11-year-old child was capable of such a gruesome and calculated crime. However, under the standards governing appellate court review of weight and sufficiency of the evidence challenges, we discern no reversible error in the juvenile court's decision.

In Appellant's third and final argument, he asserts the juvenile court improperly reassessed the credibility of several witnesses. "Following the rendering of a verdict, the trial court is limited to rectifying trial errors and cannot make redeterminations concerning credibility and the weight of the evidence." *Commonwealth v. Melechio*, 658 A.2d 1385, 1389 (Pa. Super. 1995). Recently, this Court explained:

> [A] post-verdict court may not reweigh the evidence and change its mind as the trial court did herein. Although a post-verdict judge may question a verdict, his discretionary powers are limited to a determination of whether the evidence was sufficient to uphold the original verdict, and he may not alter the original verdict and substitute a new one. *Commonwealth v. Rawles*, 501 Pa. 514, 462 A.2d 619 (1983). The trial court's verdict must be accorded the same legal effect as a jury verdict. *Commonwealth v. Meadows*, 471 Pa. 201, 369 A.2d 1266, 1268 n. 5 (1977). Post-trial, the court cannot re-deliberate as it is no longer the fact finder. Just as jurors are not permitted to testify as to the mental processes that led to their verdict, so is the trial court precluded from testifying as to its flawed thought process as a fact finder.

*Commonwealth v. Robinson*, 33 A.3d 89, 94 (Pa. Super. 2011), *appeal denied*, 42 A.3d 292 (Pa. 2012).

This doctrine prohibits a trial court from **altering** its verdict. In *Robinson*, the trial court found the defendant guilty and then *sua sponte* issued a not guilty verdict because, according to the trial court, it failed to consider and weigh character evidence favoring the defendant. *Id.* at 91. Likewise, in *Melechio*, the trial court found the defendant guilty of third-degree murder after trial, and subsequently vacated the convictions because it did not credit the testimony of a significant witness against the defendant. *Melechio*, 658 A.2d at 1387.

Appellant also cites *Commonwealth v. Parker*, 451 A.2d 767, (Pa. Super. 1982), in which the trial court *sua sponte* changed its guilty verdicts to not guilty two weeks after the original verdicts were entered and recorded on the docket. In its order, the trial court noted that it reconsidered the facts. *Id.* at 768-69. We held that a trial court could not change a guilty verdict to not guilty based on reconsideration of the facts. *Id.* at 769.

The foregoing case law is inapplicable because the juvenile court did not alter its adjudication. Furthermore, all of the reasoning the juvenile court offered in its May 19, 2015 post-remand opinion is consistent with its original adjudication of delinquency. Appellant offers four specific instances of allegedly improper reassessment of facts. First, he argues the juvenile court improperly reassessed facts in finding it unlikely that an unidentified

intruder could have located Appellant's shotgun, used it to commit the murder, and replaced it in the upstairs bedroom. It is true that the juvenile court did not previously offer this reasoning in support of its adjudication. In employing that reasoning, the trial court relied on its findings that Appellant's .20 gauge shotgun was the murder weapon, that the shotgun was moved upstairs to Appellant's bedroom days before the murder, and that only Appellant, J.H. and the Victim knew the shotgun's location on the morning of the murder. The juvenile court's post-remand opinion merely draws reasonable inferences from the facts of record. The court's reasoning is consistent with its adjudication and consistent with the legal standard for assessing the sufficiency of the evidence.

Next, Appellant argues that the juvenile court now rejects the credibility of Elana Somple, the forensic expert who testified as to the gunshot residue on Appellant's clothing. Appellant believes the juvenile court has belatedly determined that Somple was not credible in testifying that residue can transfer from one object to another. Appellant misreads the juvenile court's opinion. The juvenile court did not reject Somple's testimony that residue transfer can occur. The court simply found that no residue transfer occurred in this case. The juvenile court deemed it unlikely that gunshot residue transferred from an outer layer of clothing to jeans or a shirt. Once again, the court's reasoning is consistent with the established facts and its original adjudication.

Third, Appellant argues that the juvenile court improperly reassessed C.B.'s testimony. In its post-remand opinion, the juvenile court noted that it did not believe C.B.'s testimony about the close relationship among Appellant, the Victim, and the Victim's daughters. Juvenile Court Opinion, 5/19/15, at 25, 36-37. The juvenile court discounted C.B.'s testimony based on C.B.'s obvious incentive to protect his son. It is true that the juvenile court did not explicitly reject C.B.'s credibility prior to its post-remand opinion. Regardless, the juvenile court's post-remand opinion is consistent with its original adjudication. In adjudicating Appellant delinquent, the juvenile court implicitly did not believe that Appellant and the Victim had a good relationship. Likewise, the juvenile court credited the evidence eliminating Harvey as a suspect even though C.B. implicated Harvey as a person who would murder the Victim. Clearly, the juvenile court either found C.B. not credible or discounted his testimony because he is Appellant's father.

Finally, Appellant argues the juvenile court improperly reassessed the credibility of Appellant's statements to Trooper Wilson. In its post-remand opinion, the juvenile court noted, among other things, that Appellant gave two different accounts of the black truck he allegedly saw when he was leaving for school on the morning of the murder. In his first statement, Appellant did not mention that a person was in the truck. Later that evening, he told Trooper Wilson a person was "ducking over" in the truck

and the truck's lights were "sort of half on." N.T. Trial, 4/11/12, at 75. In its post-remand opinion, the juvenile court noted that it disbelieved Appellant's account based on those inconsistencies. Juvenile Court Opinion, 5/19/15, at 49-50. Again, it is true that the juvenile court never addressed this discrepancy until its post-remand opinion. Regardless, the juvenile court's adjudication of delinquency clearly establishes that the court disbelieved Appellant's account of his actions that morning. We observe, for example, that Appellant denied having fired his .20 gauge shotgun on the morning in question. Despite this, the juvenile court found that Appellant committed the killing with that weapon.

Appellant's third and final argument lacks merit because it relies entirely on case law involving altered verdicts. Instantly, the juvenile court did not alter its adjudication of delinquency. Furthermore, Appellant has failed to cite any instances of a reassessment of facts or a redetermination of credibility. The juvenile court's reasoning in its post-remand opinion is consistent with its original adjudication and consistent with the standards governing challenges to the weight and sufficiency of the evidence.

In summary, we have reviewed Appellant's three arguments—a challenge to the sufficiency of the evidence, a challenge to the weight of the evidence, and a challenge to the juvenile court's post-remand findings and analysis—and discerned no error on the part of the juvenile court. We therefore affirm the order of disposition.

Order of disposition affirmed.

Judge Olson Joins the Opinion.

Judge Musmanno Notes Dissent.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/1/2016